# EXHIBIT 1

WILLIAM ANDERSON; July 7, 2010

Page 1

1                    UNITED STATES DISTRICT COURT
             WESTERN DISTRICT OF WASHINGTON AT SEATTLE
2     _____

3     WILLIAM ANDERSON,                    )
                                           )
4            Plaintiff(s),                 )
                                           )
5     vs.                                  )  C09-0850 RAJ
                                           )
6     THE BASEBALL CLUB OF SEATTLE         )
      d/b/a THE SEATTLE MARINERS;          )
7     THE CITY OF SEATTLE; JASON           )
      WEAVING; LARRY HARVEY; LARRY         )
8     MEYER; OFFICER TIMOTHY               )
      RENIHAN; TRENT BERGMAN;              )
9     OFFICER DAVID SULLIVAN;              )
      OFFICER JUAN ORNELAS; JOHN           )
10    DOE NOS. 1-10,                       )
                                           )
11           Defendant(s).                 )

12    _____

                 DEPOSITION UPON ORAL EXAMINATION OF
13                        WILLIAM ANDERSON

14    _____

15                        10:10 A.M.

16                      JULY 7, 2010

17            705 SECOND AVENUE, SUITE 1500

18                   SEATTLE, WASHINGTON

19

20

21

22

23

24

25    REPORTED BY:  MARY L. GREEN, CCR 2981

WILLIAM ANDERSON; July 7, 2010

Page 52

```
 1        A.   Earlier that day, yes.
 2        Q.   Do you recall any actual sales that you made
 3   that day, sales of Mariners tickets?
 4        A.   No.  I can't remember.
 5        Q.   Did you have any physical contact with Officer
 6   Renihan or the other police officers on June 18, 2006,
 7   in the incident described in your complaint?
 8        A.   It's too vogue.
 9        Q.   Too vague?
10        A.   Vague, yeah.
11        Q.   By physical contact, I mean did they come into
12   touching -- let me rephrase the question.  Did they
13   ever touch you or did you ever touch them?
14        A.   No.
15        Q.   In your complaint, which is Exhibit Number 3
16   -- I think it's the one on your left there -- you'll
17   find that entry that describes the June 18, 2006,
18   incident.  Do you think it would be handier if we
19   stapled that together?
20        A.   Yeah.  I think.
21        Q.   I think, Mr. Anderson, somewhere around page 4
22   or 5 toward the bottom of that you describe the result
23   of your interaction with the officers; that you lost
24   sales and so forth.  Can you find that portion?
25        A.   The results of what?
```

WILLIAM ANDERSON; July 7, 2010

1    to court for those?

2        A.   No, sir.

3        Q.   Had you ever been cited before June 18, 2006,

4    for anything associated with ticket sales around the

5    stadium complex?

6        A.   Repeat that again.

7        Q.   Had you ever been cited prior to June 18,

8    2006, for ticket sale activities around the stadium

9    complex?

10       A.   Have I ever been cited before?

11       Q.   Before 2006, June 18.

12       A.   Yes.

13       Q.   Did you have to go to hearings associated with

14   that citation?

15       A.   Yes.

16       Q.   So what was it about the June 18, 2006, August

17   2, and August 27, 2006, citations that led you to

18   believe you wouldn't have to come to court for

19   hearings?

20       A.   The difference was that I received citations

21   and there was several incidents where I did not receive

22   any citations.

23       Q.   But on the ones where you received citations,

24   you had to go to hearings, correct?

25       A.   Yes.

WILLIAM ANDERSON; July 7, 2010

Page 67

```
 1      A.   Which one are you talking about, sir?

 2      Q.   August 2, 2006.

 3      A.   Yeah.  They took my tickets from me.

 4      Q.   How many tickets?

 5      A.   I believe it was two.

 6      Q.   Where did you get the tickets?

 7      A.   Bought it from a customer.

 8      Q.   How much did you pay for it?

 9      A.   Can't remember.

10      Q.   Do you have that information recorded anywhere

11   so that you can figure out what you paid for them?

12      A.   No.

13      Q.   How many tickets had you sold that day?

14      A.   Can't remember.

15      Q.   Do you know if you'd sold any?

16      A.   Sure I sold some that day.

17      Q.   How can you be sure?

18      A.   Once again, I'm sure I sold some that day.

19      Q.   Can you articulate why you're sure you did?

20      A.   No.

21      Q.   Mr. Anderson, if you are in the process of

22   trying to sell tickets outside of the Mariners game

23   after you've purchased them from fans or from whatever

24   source you get them from, do I understand correctly

25   that the method is essentially to make it known to
```

WILLIAM ANDERSON; July 7, 2010

1    Q.  Let's turn to April 14 of 2009, the next
2  incident in your complaint.  Were tickets taken from
3  you on April 14 of 2009?
4    A.  Yes.
5    Q.  How many?
6    A.  Two.
7    Q.  How do you know that?
8    A.  Because there were two tickets I was selling
9  to the customer that I had across the street from the
10  Mariners stadium.
11    Q.  I'm sorry, Mr. Anderson.  I missed the first
12  three words of that sentence.  Will you repeat it for
13  me?
14    A.  I had a customer when we were approached.  He
15  was interested in buying two tickets from me, and those
16  are the two tickets that were taken from me.
17    Q.  And which officer took those tickets from you?
18    A.  It was actually two officers there at the same
19  time.  I can't remember who I gave the tickets to.  I
20  just know that they grabbed the tickets from me.
21    Q.  Where did you get those tickets?
22    A.  I bought them.
23    Q.  From who?
24    A.  I can't remember who I bought it from, but I
25  bought them from a customer that was outside selling

Page 93

1          He just asked for my ID, and then another
2    gentleman came, taller gentleman came, and they asked
3    for my ID and asked for the tickets.  I gave them the
4    tickets, and then I told them I didn't do nothing
5    wrong.
6          I said -- the gentleman even explained to them
7    that we were coming across the street to close the deal
8    and that I explained to him that we needed to go across
9    the street if he wanted to get some tickets from me.
10         So I requested to get the guy's information,
11   his ID information so he could be my witness, and they
12   refused to let me get his information.  They told him
13   to go ahead and walk across the street and get out of
14   here or not get out of here but just go across the
15   street and get away.
16         After that I had called 911 immediately during
17   all this, because I wasn't sure who they were, and I
18   just wanted to get some assistance from an officer who
19   could sort this out, because I was getting tired of
20   getting harassed by the officers, so I called 911 to
21   get an officer to come down.
22         Right when I called the tall gentleman who
23   came across the street, who was an off duty officer, I
24   suppose, he got on his phone and called somebody and
25   was like -- I don't know exactly what he said, but all

WILLIAM ANDERSON; July 7, 2010

Page 114

```
 1    incidents were allegedly observed.

 2            There's an objection, and then the answer

 3    says, "Plaintiff believes that he has witnessed these

 4    incidents at almost every game he has worked.

 5    Investigation and discovery is continuing.  This answer

 6    may be supplemented."

 7            Can you tell me of any particular instance

 8    where you've seen police department officials ignoring

 9    mobile vending going on around the stadium?

10        A.  Other than tickets?

11        Q.  Other than tickets.

12        A.  Yes.

13        Q.  Tell me a specific instance.

14        A.  People selling parking tickets.  People that

15    got illegal -- main thing that I've witnessed is the

16    parking, people selling parking tickets.

17        Q.  Does that occur up by the parking facility

18    there that's by the stadiums?

19        A.  It occurs all around the stadium.

20        Q.  Where are the people selling tickets to park?

21        A.  On the Mariners property.

22        Q.  Where on the Mariners property?

23        A.  They're just -- they're -- they're basically

24    selling them wherever they can sell them.  It doesn't

25    matter.
```

WILLIAM ANDERSON; July 7, 2010

Page 115

1      Q.  Are these people who are standing by lots to

2   entice people to come in and park in the lot?

3      A.  All I know is that they're standing by the

4   lots.  They're just trying to sell their parking

5   tickets.

6      Q.  So they're trying to fill up the lots around

7   the stadium by --

8      A.  No.  These are people that have extra parking

9   tickets that are Mariner fans.

10      Q.  Are any of these people on the sidewalks that

11   are actually adjacent to the Safeco Field facility?

12      A.  You got people that are adjacent.  You got

13   people that are on Mariners property selling parking

14   tickets.

15      Q.  I'm confused, because wouldn't the people that

16   are already by the stadium, wouldn't they have already

17   parked someplace?

18      A.  Sometimes they have extra tickets.

19      Q.  Extra --

20      A.  I mean extra parking tickets.

21      Q.  I understand, but why would they try to sell

22   them to people who have already parked someplace?

23      A.  They're trying -- they're actually trying to

24   catch people -- sometimes they try to approach us to

25   buy a parking ticket along with their tickets or they

WILLIAM ANDERSON; July 7, 2010

Page 116

1    might be trying to sell them to somebody that's driving
2    by because they know they're going to the game and so
3    they're trying to catch them before they go into the
4    parking lot so they can sell their parking tickets to
5    them that are actually, you know, parking tickets for
6    the Mariners parking lot.
7         Q.  The Mariners parking lot, are you talking
8    about the parking facility that is toward downtown and
9    a little bit toward I-5 from Safeco Field?
10        A.  No, sir.
11        Q.  Which Mariners parking facility are you
12   talking about?
13        A.  The one that's located off of Occidental and
14   Edgar Martinez.
15        Q.  Okay.  And it requires a ticket to get in?
16        A.  It requires a parking ticket to get in, yes.
17        Q.  Have you ever seen police officers or law
18   enforcement officers observe these sales and ignore
19   them?
20        A.  Actually, I really don't pay attention, but I
21   notice that they never get harassed for selling parking
22   tickets.
23        Q.  Have you seen anything else in the way of
24   selling of mobile vending of items other than tickets
25   to the sporting events near the stadium that have been

WILLIAM ANDERSON; July 7, 2010

Page 117

```
 1    ignored by law enforcement?
 2         A.   That's the only thing I can think of right
 3    now.
 4         Q.   Have you seen other ticket sellers issued
 5    citations for selling tickets?
 6         A.   Yes, sir.
 7                   (Mr. Mullins left the room.)
 8         Q.   (BY MR. BUCK) Who?
 9         A.   I've just witnessed people being given
10    citations.
11         Q.   Have you seen Ben issued citations for selling
12    anything?
13         A.   No.
14         Q.   How about Andre?
15         A.   I've witnessed -- I've witnessed one
16    situation, I believe, where he was harassed by
17    officers.
18         Q.   How about Matt -- I don't know his last name.
19    How about Matt?
20         A.   There's been a lot of situations over the
21    years.  I can't remember them all.
22         Q.   Can you tell me specifically whether you've
23    seen Matt approached by officers for selling tickets?
24         A.   I can't remember exactly when, but I've seen
25    Matt approached.
```

WILLIAM ANDERSON; July 7, 2010

Page 122

1        A.   I'm not sure.

2        Q.   Now, I think what prompted that question was

3   your statement that you had done a lot of research back

4   when you were trying to get a permit.  Did I understand

5   that correctly?

6        A.   I've done a lot of research, yes.

7        Q.   And before you went in to seek that permit,

8   what sort of research did you do?

9        A.   Checked to see on the bonding, how much the

10  bonding insurance was, getting information from SDOT on

11  the correct way on the process of selling tickets, just

12  filling out an application to apply and do everything

13  the correct way.

14       Q.   Did you actually go to SDOT to ask them about

15  the permitting process?

16       A.   Yes, I did.

17       Q.   Do you remember who you talked to?

18       A.   It was a gentleman that was in the front

19  office.  The gentleman's name was Keith.

20       Q.   Do you remember what kind of a permit you

21  applied for in 2005?

22       A.   It was a permit, street permit, street use

23  permit.

24       Q.   Was that for a fixed location?

25       A.   Yes, it was.

WILLIAM ANDERSON; July 7, 2010

Page 124

```
1        A.   I don't recall.  I don't remember.
2        Q.   In 2005, were you successful in getting the
3   permit?
4        A.   I was told by the gentleman that worked in
5   SDOT -- I can't remember if it was Keith Miller, but
6   the gentleman that I was dealing with on a consistent
7   basis when I was going to SDOT, he said that the City
8   attorney gave him the go that it was okay and that it
9   was legal to do so, but he told me he was not going to
10  give it to me.
11       Q.   Did he tell you why he wasn't going to give it
12  to you?
13       A.   He just told me he didn't want to give it to
14  me.
15       Q.   Do you remember any reason given by Mr. Miller
16  for why you were not going to get that permit?
17       A.   He just told me he didn't want to give it to
18  me.
19       Q.   Do you know, Mr. Anderson, whether your effort
20  to obtain the permit was before or after the city
21  council revoked the anti-scalping law?
22       A.   Repeat that question again, please.
23       Q.   Sure.  Let me ask a more fundamental question.
24  Are you aware that the City used to have a law that
25  prohibited scalping tickets?
```

WILLIAM ANDERSON; July 7, 2010

Page 125

```
 1        A.   Was I aware then or now?

 2        Q.   At any time have you been aware of that?

 3        A.   I'm aware of that now.

 4        Q.   You're aware of it now?

 5        A.   But I was aware of it also as of yesterday

 6   too.

 7        Q.   Do you know when the City revoked that

 8   ordinance, the anti-scalping ordinance?

 9        A.   I have no idea.

10        Q.   We went through a list of folks that sell

11   tickets around the stadium a little earlier.  We went

12   through quite a few names there.  Do you know any other

13   ticket sellers that are routinely out there trying to

14   get rid of or trying to sell Mariners tickets?

15        A.   Yes, I do.

16        Q.   Who are the other ones you know?

17        A.   I know a guy named Van.

18        Q.   Do you know Van's last name?

19        A.   I'm not sure.

20        Q.   Would his number be in your phone by any

21   chance?

22        A.   No.

23        Q.   Do you know any others?

24        A.   I know Eric.

25        Q.   Eric?
```

WILLIAM ANDERSON; July 7, 2010

Page 131

```
1        A.   Not true.

2        Q.   When did you next try to get a permit?

3        A.   I made an attempt several months ago.

4        Q.   In 2010?

5        A.   Yes, sir.

6        Q.   Tell me about that effort.

7        A.   We went to SDOT to -- I went to SDOT to apply,

8    and a gentleman up there -- and I can't remember his

9    name -- basically he told us that there was no way that

10   I can get an application to get a permit to sell

11   tickets.

12       Q.   You don't remember that fella's name?

13       A.   No, I don't.

14       Q.   Were you alone when you went up and talked to

15   that gentleman?

16       A.   No, sir.

17       Q.   Who was with you?

18       A.   I had a lady with me.

19       Q.   Who was that lady?

20       A.   I forgot her name.  It was a lady that went

21   with me.  I forgot her name.

22       Q.   Why was she with you?

23       A.   She was going with me to see exactly if they

24   were going to allow me to get a permit or not.

25       Q.   Why did she have any interest in that?
```

WILLIAM ANDERSON; July 7, 2010

Page 133

```
 1          A.  So what was the question again, sir?

 2          Q.  Mr. Young told you that SDOT doesn't issue

 3    mobile vending permits?

 4          A.  Basically that's what he said.

 5          Q.  Did he tell you you couldn't apply for one of

 6    the other permits that they do issue around the

 7    stadiums?

 8          A.  We never really spoke on that issue.

 9          Q.  Have you ever attempted since 2005 to obtain

10    any other kind of a permit, any permit other than a

11    mobile vending permit in order to lawfully sell tickets

12    around the stadium?

13          A.  No, sir.

14          Q.  Have you done any research as to whether or

15    not that is an option?

16          A.  No, sir.

17          Q.  Do you know what the difference is between a

18    stadium vending permit and a mobile vending permit?

19          A.  No, sir.

20          Q.  Have you ever investigated where City

21    ordinances allow mobile vending to occur in the city of

22    Seattle?

23          A.  No, sir.

24                    (Deposition Exhibit 6 was marked for

25                     identification.)
```

WILLIAM ANDERSON; July 7, 2010

1      argue about that.

2                    MS. MATHEWS:   I hope we won't have to

3      argue about that.

4                    MR. FORD:   However, I do have a couple

5      questions of my own.

6                            EXAMINATION

7       BY MR. FORD:

8          Q.   Mr. Buck asked you some questions earlier

9      having to do with seeing people selling things around

10     the stadium.  Have you ever seen anybody selling like

11     hats or anything like that or team kind of things

12     around the stadium?

13         A.   Yes, I do.

14         Q.   And have you seen them selling -- you know

15     those lights that people have they can put around their

16     neck?

17         A.   Yes.  They sell lights.  I forgot what they

18     call them.  Fluorescent green lights.

19         Q.   What about peanuts, popcorn, Cracker Jack?

20         A.   Peanuts, popcorn, Cracker Jacks.  They walk

21     around and they sell candy bars.  Sometimes I see them

22     walking around selling ice cream.

23         Q.   Do you know anything about what kind of

24     permits those people have?

25         A.   I have no idea.

WILLIAM ANDERSON; July 7, 2010

Page 182

1        Q.   Have you seen those people harassed by the

2    police or ticketed by the police?

3        A.   No.

4        Q.   Mr. Buck asked you some questions about a cell

5    phone that you've got some pictures on.

6        A.   Correct.

7        Q.   Can you explain a little bit about what the

8    status of that cell phone is and why?

9        A.   The reason why we don't have the pictures is

10   because the cell phone screen is broke, so we're

11   waiting.  We're going to get it repaired as soon as

12   possible.

13            MR. FORD:  And I'll just tell you we

14   want to make sure we don't do anything that erases

15   them, so that's why we've been careful.

16       Q.   (BY MR. FORD) Now, the complaint, do you have

17   that?  Where is that?  Here we go.  Exhibit Number 3.

18   And I just want to make sure you know what we're

19   talking about with all these different dates.  Can you

20   take a look, please, at this June 18, 2006,

21   description?  Have you had a chance to read that over?

22       A.   Yes.

23       Q.   I actually asked you to read that over earlier

24   at the break, right?

25       A.   Yes, sir.

WILLIAM ANDERSON; July 7, 2010

```
                                                              Page 186
1                        CORRECTION & SIGNATURE PAGE
2       RE:   ANDERSON v. THE BASEBALL CLUB OF SEATTLE;
              USDC; C09-0850 RAJ;
3             WILLIAM ANDERSON; July 7, 2010
                            Reported By:  Mary L. Green
4
           I, WILLIAM ANDERSON, have read the within transcript
5       taken July 7, 2010, and the same is true and accurate except
        for any changes and/or corrections, if any, as follows:
6
        PAGE/LINE            CORRECTION              REASON
7
        79:24               I'm not sure         Upon review of the question in
8                                                my transcript, I'm not sure.

9
        88:8                I spoke to an African  Upon review of the question in
10                          American Officer.  His my transcript, I'm not sure.
                            name might not be Daman.
11

12                                                RECEIVED

13                                                AUG 1 3 2010

14                                           YAMAGUCHI OBIEN & MANGIO

15

16

17                                               ORIGINAL

18

19

20

21
              Signed at _____Seattle_____, Washington, on this
22
        date: _August 12, 2010_____.
23

24
              WILLIAM ANDERSON
25
```

Yamaguchi Obien Mangio Reporting & Video * www.yomreporting.com
520 Pike Street, Suite 1320 Seattle, WA 98101 * (206) 622-6875 * 1 (800) 831-6973

WILLIAM ANDERSON; July 7, 2010

Page 187

1                    REPORTER'S CERTIFICATE

2

3          I, MARY L. GREEN, the undersigned Certified Court

4     Reporter, pursuant to RCW 5.28.010 authorized to administer

5     oaths and affirmations in and for the State of Washington, do

6     hereby certify:

7          That the sworn testimony and/or proceedings, a transcript

8     of which is attached, was given before me at the time and

9     place stated therein; that any and/or all witness(es) were

10    duly sworn to testify to the truth; that the sworn testimony

11    and/or proceedings were by me stenographically recorded and

12    transcribed under my supervision, to the best of my ability;

13    that the foregoing transcript contains a full, true, and

14    accurate record of all the sworn testimony and/or proceedings

15    given and occurring at the time and place stated in the

16    transcript; that I am in no way related to any party to the

17    matter, nor to any counsel, nor do I have any financial

18    interest in the event of the cause.

19         WITNESS MY HAND AND DIGITAL SIGNATURE this 14th day of

20    July, 2010.

21

22    MARY L. GREEN
      Washington State Certified Court Reporter, #2981
23    mgreen@yomreporting.com

24    Click Link to Verify Signature:

25    (Https://digitalid.verisign.com/services/client/index.html)